THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH ZIDEROWSKI *et al.* Plaintiffs in Error.

*Opinion filed April 20, 1927.*

1. CRIMINAL LAW—*confession objected to must be found voluntary before being admitted.* Confessions are competent evidence only when voluntarily made, and upon objection that a confession is involuntary the defendant is entitled to have the evidence of the circumstances under which it was made heard by the court out of the presence of the jury for the purpose of determining, as a preliminary question, whether the confession is admissible.

2. SAME—*reason of rule requiring confession to be voluntary.* The rule requiring a showing that a confession is voluntary before it is competent evidence is not to protect a guilty person against his truthful confession, but is designed to guard the innocent against a false confession made under duress, promise of reward of some nature, or other inducement.

3. SAME—*when an alleged confession should not be admitted—co-defendant.* Where preliminary proof, not contradicted by the State, shows that a confession was forced from the defendant by use of physical violence it is not admissible against him; nor is it admissible against another defendant in whose presence it was made where it was promptly denied by such defendant.

4. SAME—*what constitutes robbery.* Robbery, within the meaning of the statute, may be committed by violence or putting in fear and feloniously taking money or other valuable thing from the person or the presence and the immediate control of the person assaulted.

5. SAME—*ownership of property taken in robbery need not be proved—variance.* An allegation in an indictment for robbery which charges that the property taken was in the care and possession of the person robbed, supported by proof, is sufficient to sustain a conviction even though the person assailed does not own the property; and in such case there is no variance even though the indictment names the owners of the property as members of a partnership and there is no proof that the parties named composed the firm.

6. SAME—*when discrepancy in name of person robbed is not material.* Under the doctrine of *idem sonans* the misspelling of a name is not a variance of which advantage may be taken when the name pronounced as misspelled conveys practically the same

sound as when pronounced as correctly spelled, and in a prosecution for robbery it is not a fatal variance that the indictment recites the name of the person robbed as Lonson while the record shows that the name was Lunson.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM J. LINDSAY, Judge, presiding.

EVERETT JENNINGS, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, EDWARD C. FITCH, and JAMES B. SEARCY, (EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Joseph Ziderowski, Max Mackowski and Frank Mackowski were indicted in the criminal court of Cook county for the robbery, while armed with a dangerous weapon, of $1220 from Margruite Lonson, the money belonging to Bruno C. Ross, Max R. Ross and Alfred A. Ross, partners by the name of A. H. Ross & Sons. The defendants pleaded not guilty. During the course of the trial a *nolle prosequi* was entered as to Max Mackowski. The jury found the other defendants guilty. Motions for a new trial and in arrest of judgment were made and denied and Ziderowski and Frank Mackowski were sentenced to the penitentiary. They prosecute this writ of error for a review of the record.

On December 23, 1924, A. H. Ross & Sons were partners engaged in the tannery business at 1229 to 1235 North Branch street, on Goose Island, in the city of Chicago. Their office was located on the second floor of the building. Marguerite Lunson was the book-keeper and occupied one of the rooms of the private office. In the same room was a safe in which the money to meet the pay-roll was kept. About 3:30 P. M. on the day mentioned two

men entered the office armed with revolvers, and while one of them guarded Miss Lunson the other took $1220 from the safe. Seven days later Ziderowski and the two Mackowski brothers were arrested as the robbers.

Immediately after the selection of the jury had been completed, and out of the presence of the jury, counsel for the plaintiffs in error moved to exclude any reference to an alleged confession by Frank Mackowski from the opening statement of the State's attorney, on the ground that Mackowski was afflicted with syphilis and possessed the mind of a child; that he would answer questions as desired, and that the confession was involuntary because it was procured through corporal beating administered by the police officers, and when made was promptly denied by the other defendants. In support of this motion Mackowski testified that he was arrested on December 30, 1924, about 7:30 P. M., on his way home from a restaurant; that he was put in an automobile, and when questioned denied that he was guilty of the robbery; that one of the officers struck him in the jaw and knocked out two of his teeth, so that he could not "move his face" for about two hours thereafter, and that he then admitted that he, with his brother Max and Ziderowski, had committed the crime. At the court's request he opened his mouth and showed his loss of the teeth. When asked why he made the confession, an objection to the question was made and sustained. He testified that when later he talked to police officers in the presence of his brother Max and Ziderowski admitting the robbery and implicating them also, both denied any participation in the crime, and Max said twice, "This is a —— of a thing for you to do to me to say I was in that job with you; I was no more with you than a man in the moon;" that he, Mackowski, was held at the detective bureau and the police station for two days, and that he did not commit the robbery charged.

Josephine H. Martine, a sister of Frank and Max Mackowski, testified that she was at home with her brother

Max and Ziderowski when police lieutenant Hugh Mc-
Carthy came; that he stated that her brother Frank had
said the guns were there, and when she answered that she
knew nothing about them, he replied that she lied, and ran-
sacked the place. The officer, she said, had no search war-
rant. Max Mackowski testified that he was at home with
his sister, her son, Ziderowski and John Devine when offi-
cer McCarthy and two men entered, and that he and Zid-
erowski were arrested and taken to the police station.

Plaintiffs in error offered to prove by Dr. O'Connor
that Frank Mackowski was afflicted with syphilis and was
on the verge of paresis; that he was readily susceptible to
suggestion and would answer as the questioner desired.
The court stated that if Dr. O'Connor were present his tes-
timony concerning mental capacity would be no better than
the testimony of Mackowski, who seemed to comprehend
the questions asked and answered without hesitation and
with apparent intelligence, and that, although he might
have paresis, it did not show that he did not know the
nature or character of what he said. The motion to ex-
clude the confession was denied. When counsel insisted
that the confession was inadmissible as against Max Mac-
kowski and Ziderowski, who had denied it, the court stated
that the jury would pass upon that question under proper
instructions which would be given.

After the denial of the motion to exclude the confes-
sion the jury was recalled and the State proceeded to offer
its evidence. Marguerite Lunson testified that on Decem-
ber 23, 1924, about 3:30 P. M., she was alone in the office
when two men entered and inquired whether any help was
needed; that she answered in the negative and they left;
that they soon returned, each holding a small nickel-plated
revolver, and commanded her to put up her hands; that one
pointed his weapon at her while the other went to the safe
and took $1220 in money from it; that they then put her
in the washroom; that she watched the man who took the

money rather than the one who confronted her with the revolver; that the former was Frank Mackowski, who wore a dark sweater and a dark cap, and that the men were dressed about the same.

Bruno C. Ross, one of the partners, testified that he left his place of business about 3:30 o'clock on the afternoon of the robbery and returned shortly before 4:00 o'clock; that when he entered the office he met a man with a revolver, who commanded him to put up his hands, and that after some hesitation, caused by surprise, he complied; that looking over the first man's shoulder he saw the second man with a revolver in his right hand and the pay-roll money under his left arm, and that the men put him in the washroom with Miss Lunson, the book-keeper. The witness further testified that he saw the two men again at the West Chicago avenue police station about ten days after the robbery; that Frank Mackowski was taken to the squad room up-stairs, and there, in the presence of Lieutenant McCarthy and Miss Lunson, the witness asked Mackowski certain questions, in answering which the latter confessed that he was at the office of the tannery on the day of the robbery; that Miss Lunson was present at the time and he commanded her to put up her hands; that she was put in the little room and that the witness then came, and he also was commanded to raise his hands. Objection was made to this conversation in behalf of Ziderowski and Max Mackowski on the ground that they were not present, and, so far as they were concerned, the objection was sustained.

John A. Lachel, a police officer assigned to the detective bureau, testified that on December 30, 1924, he and officer Hegborn, the driver of the automobile used by the bureau, saw Frank Mackowski on Erie street and followed him to the vicinity of Milwaukee avenue and Sangamon street; that the officers jumped out of the car, asked Mackowski his name and what he was doing; that the witness discovered in the left pocket of Mackowski's overcoat something

which Mackowski first said was his lunch, and later, upon request, after a moment's hesitation, exhibited to the officers, and that upon examination it was found to be a handkerchief containing a roll of paper money. Officer Lachel further testified that Mackowski was taken to the police station, and when asked where he obtained the money, replied that he had possessed it for some time; that the question was repeated, Mackowski hesitated, and the witness threatened to incarcerate him unless he answered; that the question was asked the third time, and Mackowski answered that he would tell later; that the witness insisted upon an immediate answer, and Mackowski replied, "I got it in a stick-up" in a restaurant around the corner; that upon inquiry it was found that no robbery had been committed in the restaurant, and that finally Mackowski informed the witness that he had obtained the money at a tannery on Goose Island about two days earlier.

Hugh McCarthy, a lieutenant of police, testified that he first saw Frank Mackowski in one of the detective bureau's automobiles in front of the police station at 731 North Racine avenue on December 30, 1924, at about 7:30 P. M.; that he asked Mackowski whom he had robbed, and the latter replied, a fruit store at Milwaukee and Elston avenues; that they drove to the place designated to inquire, but the proprietor stated that no robbery had been committed there; that after being requested to tell the truth Mackowski said that he had robbed a place on Goose Island, and they then drove to the tannery; that Mackowski stated that the robbery had been committed in the office up-stairs while a girl was present, and that a man entered as he, Mackowski, and his companion were leaving; that Mackowski was then driven to his home at 1164 Cherry street and left outside in the automobile while the witness entered the house and there found Max Mackowski, Ziderowski, one Devine, and a sister of the Mackowski brothers and her child; that he, the witness, placed the men in the house under arrest and

sent them to the West Chicago avenue police station; that he returned to the other police station with Frank Mackowski and two officers and conversed with Mackowski on the way; that Mackowski told him that at the tannery he went up-stairs with a gun, his companion drove the car, and the revolvers which they used were at his home under a pillow on the bed; that the witness, accompanied by officer Hegborn and Mackowski, went back to the latter's home on Cherry street and found two revolvers in a sewing machine drawer; that on the following day Mackowski admitted that one of these revolvers belonged to him; that he had purchased it from a man on the street, and that the two revolvers were used in the robbery. Lieutenant McCarthy further testified that Mackowski, when arrested, admitted that the money in the handkerchief, amounting to $285, was part of the proceeds of the robbery, and that on December 30, 1924, in the squad room of the police station, while the witness, Miss Lunson and two officers were present, in answer to questions put by Bruno C. Ross, Mackowski confessed his participation in the robbery, and, answering the witness, stated that he had received $305 as his share, and that four other men were implicated in it. The money and revolvers were admitted in evidence over the objections of plaintiffs in error. It was admitted that Mackowski was forty-one and that Ziderowski was twenty-five years of age.

Ten witnesses were called by the defense. Herbert J. Smith, the president and treasurer of the Fort Dearborn Lumber Company, identified a ticket introduced as an exhibit, which represented the sale of two loads of shavings on December 23, 1924, for one dollar. He testified that such a ticket was issued on all cash sales; that he was acquainted with Frank Mackowski, who was known to him as Frank Myers; that he saw him on December 23, 1924, between 10:00 and 10:30 A. M., getting a load of shavings, but that the witness was not at his place of business in the

afternoon; that Mackowski was a regular customer, and that his company did not sell shavings to any other person on that day.

L. B. Hanscom, formerly employed by the Fort Dearborn Lumber Company, testified that the ticket showing the sale of two loads of shavings on December 23, 1924, was in his handwriting; that he was acquainted with Mackowski but knew him as Frank Myers; that the latter obtained the first load between 10:00 and 10:30 A. M. on that day; that he returned between 2:30 and 3:00 P. M. for the second load and left about an hour later, and that he had a considerable sum of money in his possession when he paid for the shavings just before he left with the second load.

Joe Wisniewski testified that he was employed by the George Wild Teaming Company, at 1153 North Branch street; that he was acquainted with Frank Mackowski, who hauled three or four loads of shavings each month for the teaming company; that he met Mackowski on December 23, 1924, about 1:00 P. M., at the company's barn, where he was unloading shavings; that he returned shortly after 5:00 P. M. with another load but did not unload the shavings that night; that he, the witness, kept a record of the transaction in a book, and that Mackowski was paid five dollars per load.  Ignatz Wisniewski, the father of Joe Wisniewski, also employed by the same company, testified that he was acquainted with Frank Mackowski and that the latter delivered two loads of shavings to the witness' employer on December 23, 1924, the first about 11:30 A. M. and the second about 5:30 P. M.

John Czech testified that he worked with Frank Mackowski on December 23, 1924, hauling shavings from Twenty-second and Loomis streets to the George Wild Teaming Company's barn; that they arrived with the first load about 12:45 P. M.; that they returned to Twenty-second and Loomis streets and departed with the second

load about 4 :oo P. M., and that they left the wagon, un-loaded, at the teaming company's barn at 5 :oo P. M.

Frank Mackowski testified that he had been engaged in the shavings and sawdust business nearly thirty years; that December 23, 1924, he hauled two loads of shavings from the Fort Dearborn Lumber Company's yard, at 2259 South Loomis street, to the George Wild Teaming Company's barn, at 1153 North Branch street, in Chicago; that he obtained the first load about 10 :oo A. M. and the second about 3 :oo P. M., and that it required about an hour to make the trip from the place of purchase to the place of delivery; that a man assisted him, and that he left the wagon with the second load at the teaming company's barn. He further testified that he was arrested on New Year's eve, and after his arrest he was put in an automobile and the police started to beat him; that one officer knocked out two of his teeth; that he was taken to the police station and kept there a couple of days, and that the money which he had in his possession when arrested belonged to him and had been obtained by collecting checks. He denied specifically that he had committed or participated in the robbery charged or that he owned either of the revolvers admitted in evidence or had ever seen them before. On cross-examination he admitted that he accompanied Lieutenant McCarthy to his home; that the lieutenant, after a search, found the revolvers in the sewing machine; that he told the officer that $285 was his share of the proceeds of the robbery, and that he took the officer to the tannery and informed him that the robbery had been committed on the second floor. On re-direct examination he testified that he was in the officer's automobile in front of the house when the revolvers were found and that he did not see the officer take them from the drawer of the sewing machine.

Jonah Ziderowski, a brother of the plaintiff in error Joseph Ziderowski, testified that at the preliminary hearing in the municipal court of Chicago Bruno C. Ross testified

that his brother looked like the man involved in the robbery and that he could identify the man by his ears. Josephine H. Martine, a sister of Frank and Max Mackowski, testified that she was present at the preliminary hearing and that Ross there testified that he partly identified Ziderowski.

Thomas Degnan, who was engaged in the fruit and vegetable business at 234 West Division street, Chicago, testified that he had been acquainted with Joseph Ziderowski for eight or nine years and had employed him, and that on December 23, 1924, Ziderowski worked in his store from nine o'clock in the morning until eight or nine o'clock P. M.

Joseph Ziderowski, plaintiff in error, testified that on December 23, 1924, he was employed by Thomas Degnan in his fruit and vegetable business and had worked there since September at $30 per week; that he did not run errands or leave the store except for dinner; that he was not in the company of Frank Mackowski on December 23, 1924, nor did he participate in the robbery at the tannery that day, and that when it was sought at the preliminary hearing in the municipal court to identify the witness as the person who had committed the robbery, Bruno C. Ross testified that "he looks something like him."

On rebuttal, Bruno C. Ross testified that he did not say, at the preliminary hearing, that he identified Ziderowski by his ears, but that he did say that he identified both Ziderowski and Frank Mackowski by their general appearance.

Two affidavits were submitted on the motion for a new trial. One was by F. J. Gerty, a physician and superintendent of the Psychopathic Hospital of Cook county, who stated that Frank Mackowski had been under his observation for ten days; that he was sub-normal, of poor comprehension and his attention was fixed with difficulty; that he was suggestible to a marked degree and could be made to assent to obviously ridiculous things; that he had the mental capacity of a child six or six and one-half years of age and was irresponsible, and that although he did not

325—16

appear to be essentially criminalistic, yet in common with many mental defectives he was capable of a low order of cunning. The other affidavit was by Dr. Peter Paul O'Connor, who stated that he had attended Mackowski from January, 1921, to October, 1924, during which period he treated him for syphilis of the nervous system, and that Mackowski's mentality was impaired to the extent that he had the capacity of a child eight years of age.

The contentions made for a reversal of the judgment are: (1) That the confession of Frank Mackowski was involuntary and therefore incompetent; (2) that there were fatal variances between the allegations of the indictment and the proof; (3) that prejudicially erroneous instructions were given at the request of the prosecution; and (4) that the evidence fails to show guilt beyond a reasonable doubt.

Afer the briefs had been filed in this cause Frank Mackowski died and his death was suggested of record. It will only be necessary, therefore, to determine this cause to the extent that it concerns the plaintiff in error Joseph Ziderowski. The substance of the evidence has, however, been set forth because of its bearing upon the questions of the mental capacity of Frank Mackowski, and the voluntariness of, and the weight to be given to, his confession.

Confessions are competent evidence only when they are voluntarily made. (*People* v. *Fox,* 319 Ill. 606; *People* v. *Sweeney,* 304 id. 502; *People* v. *Buckminster,* 274 id. 435; *Robinson* v. *People,* 159 id. 115.) Upon objection that a confession is involuntary the defendant is entitled to have the evidence of the circumstances under which it was made heard by the court out of the presence of the jury for the purpose of determining, as a preliminary question, whether the confession is admissible. (*People* v. *Sweeney, supra; People* v. *Fox, supra.*) The rule requiring a showing that a confession is voluntary before it is competent evidence was not established to protect a guilty

person against his truthful confession, but is designed to guard the innocent against a false confession made under duress, promise of reward of some nature, or other inducement.

Upon the hearing of the motion to exclude the confession of Frank Mackowski on the ground that it was involuntary, the prosecution offered no evidence in denial of Mackowski's statement that at or immediately after the time of his arrest he was struck in the face by a police officer and that two of his teeth were knocked out. The loss of the teeth is undisputed. The officer charged with the assault was present in the court room but no attempt was made to deny the charge. Such an assault upon a person suspected of crime has no justification. The purpose of the assault, obviously, was to procure a confession, which immediately followed. The defense offered affirmative evidence in support of its motion to exclude the confession. The State did not offer, and the court did not hear, any evidence of a contradictory character. The evidence is uncontradicted that Mackowski's confession was forced from him by physical violence. The confession was involuntary and the motion to exclude it should have been granted. Moreover, it implicated Ziderowski, and when made in his presence it was promptly denied by him. Its admission in evidence constitutes reversible error.

One of the variances charged between the allegations of the indictment and the proof is, that the prosecution should have proved that the money taken belonged to the three individuals composing the partnership of A. H. Ross & Sons. The indictment alleges that the money taken was in the care, custody and control of Margruite Lonson. The evidence shows that she was the book-keeper in charge of the safe and its contents and that she was the only person present in the office when the robbery was committed. Robbery, within the meaning of the statute, may be committed by violence or putting in fear and feloniously taking money

or other thing of value from the person or the presence and the immediate control of the person assaulted. (*O'Donnell v. People,* 224 Ill. 218.) An allegation in an indictment which charges that the property taken was in the care and possession of the person robbed, supported by proof, is sufficient to sustain a conviction for robbery even though the person assailed does not own the property. *People v. Knox,* 302 Ill. 471.

Another variance which is asserted and said to be fatal is that the indictment alleges that the money taken was in the care, custody and control of Margruite Lonson, while the evidence shows that Marguerite Lunson was the name of the book-keeper in charge of the safe and its contents. Absolute accuracy is not essential in the spelling of names either in civil or criminal proceedings. If the name, when pronounced as misspelled, conveys practically the same sound as the name correctly spelled, the misspelling, under the doctrine of *idem sonans,* is not a variance of which advantage may be taken. *O'Donnell v. People, supra; Barnes v. People,* 18 Ill. 52.

We have examined the instructions of which complaint is made and find the criticisms upon them to be without merit. It is highly improbable that these instructions will be given on another trial, and it is therefore unnecessary to review them at length.

The remaining contention, that the evidence fails to show guilt beyond a reasonable doubt, involves a consideration of the weight of the whole evidence, from which we refrain because another trial is necessary.

The judgment is reversed and the cause is remanded to the criminal court of Cook county for a new trial.

*Reversed and remanded.*